UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Evelyn Essa,
      Plaintiff

      v.                                Case No. 19-cv-222-SM
                                        Opinion No. 2020 DNH 179

Genzyme Corporation,
      Defendant


**O R D E R**


Evelyn Essa brings this action against her former employer, Genzyme Corporation, alleging that she was the victim of unlawful age discrimination and wrongfully (constructively) discharged from her job.  Genzyme denies that it discriminated against Essa in any way or that she was constructively discharged.  It moves for summary judgment on all claims in Essa's complaint.  Essa objects.


For the reasons discussed, Genzyme's motion for summary judgment is granted.


**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the

nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

"As to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact."  Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment."  Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52 (1st Cir. 2014).  See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Factual Background**

The facts underlying Essa's claims are somewhat complicated. Consequently, they warrant a fairly detailed recounting. Essa began working for Genzyme in 2013, with twenty years of experience as a sales representative at other pharmaceutical companies. Initially, she worked in the Southern Arizona area, as a full-time Senior Area Business Manager – a pharmaceutical sales representative position. In late 2014, she requested a transfer to New Hampshire, which Genzyme approved.

Essa began working in New Hampshire in January of 2015. She was 64 years old at the time. Her supervisor was Ryan Emerson, the Regional Business Director responsible for Essa's new territory. As part of her job, Essa provided information to healthcare providers and patients about a Genzyme product called Aubagio, which is used to treat multiple sclerosis ("MS"). She was responsible for organizing and attending informational programs at which MS patients (whom Genzyme calls "Patient Ambassadors") shared their personal experiences with other attendees, and physicians provided information about treatment options.

During the period of Essa's employment, Genzyme contracted with two entities to help sales representatives organize those

educational programs: VPR Patient Outreach and American Health
Media.  Parenthetically, the court notes that this area is
highly regulated and, while the parties do not discuss it in
detail, it is clear from the record that Genzyme had to be quite
careful about how it advertised and conducted those patient
outreach programs, how (and by whom) treatment information was
provided to attendees, and how (and by whom) information about
those attendees was collected.

After Essa transferred to New Hampshire, she asked her new
supervisor, Emerson, if she could continue to work with a man
named Wayne Twitchell, who runs an organization called MS
Encouragement Organization ("MSEO").  Twitchell and MSEO
organize support groups for MS patients in various states.  Essa
had worked with Twitchell and his organization while she was in
Arizona to assist her in sharing information about Genzyme's
products with MSEO members and MS patients who attended MSEO
support group meetings.  Although Emerson was not familiar with
Twitchell or his organization, he agreed to allow Essa to
continue working with them.  He did, however, send an email to
Twitchell to make clear the role that he expected Twitchell and
MSEO to play in Genzyme-sponsored patient programs, and to
ensure that neither Twitchell nor MSEO caused any regulatory
compliance issues for Genzyme.  To that end, he explained that

Genzyme representatives "should have complete ownership of
program logistics" and those programs "can't appear to be co-
sponsored" by MSEO.  Rather, they must be marketed as Genzyme
events, using Genzyme-approved marketing and promotional
materials.  Additionally, Emerson informed Twitchell that, as
required by Genzyme's standard practices, all patient RSVP's to
Genzyme-sponsored programs should be directed to American Health
Media ("AHM"), the entity with which Genzyme had contracted to
handle such matters.  See Email from Emerson to Twitchell
(document no. 23-14).

As time went on, Emerson became increasingly concerned that
Twitchell was not complying with those instructions, which led
to friction between the two men.  Given Essa's close
relationship with Twitchell (and her reliance upon his services
to help her promote the Genzyme product she represented), Essa
perceived that friction as a threat to her ability to perform
her job.

About three months into her tenure in New Hampshire, in
March of 2015, Essa suffered what she describes as a cardiac
emergency.  She was transported to the hospital, where she
remained for two days.  At the same time, Essa alleges that
"Emerson started a dispute with Mr. Twitchell," – that is, the

email referenced above - and made various "demands" about the
patient information programs.  In Essa's view, those "demands"
were unreasonable and aimed at undermining her relationship with
Twitchell and MSEO.  She also ascribes significance to the
timing of Emerson's actions, suggesting that he deliberately
waited until she was in the hospital to contact Twitchell.  The
implications of that claim are unclear.

Essa's characterization of Emerson's email to Twitchell
(and her speculation about Emerson's timing and underlying
motivation), is both odd and a bit misleading.  See Plaintiff's
Memorandum (document no. 23-1) at 5.  Emerson merely stated how
he (and Genzyme) expected the Genzyme-sponsored patient programs
to be organized, marketed, and operated; it does not appear he
was trying to "start a dispute."  See Email from Emerson to
Twitchell dated March 21, 2015 (document no. 23-14).  See also
Email from Emerson to Twitchell dated March 25, 2015 (document
no. 23-16) ("I will continue to assume you will be working on
all of Lynne's programs now and moving forward."); Email from
Emerson to various sales reps dated March 26, 2015 (document no.
23-17) (discussing the conditions under which Area Business
Managers other than Essa might employ MSEO's services).  Nor
does it appear that Twitchell interpreted Emerson's March 21

email as hostile or threatening.  See Twitchell Response
(document no. 23-15).


Nevertheless, Essa saw Emerson's email as the start of his
efforts to "interfere with and/or terminate [her] relationship
with MSEO and Wayne Twitchell," Plaintiff's Memorandum at 6 –
presumably motivated by his alleged bias against her age.  It
probably bears repeating that just weeks earlier, Essa asked
Emerson if she could continue to work with Twitchell and Emerson
granted that request.  Why Essa believes Emerson would allow her
to continue her relationship with Twitchell only to immediately
seek to undermine it is unexplained.


In further support of her claim that Emerson was
undermining her career, creating an intolerable workplace,
and/or discriminating against her on the basis of her age, Essa
alleges that in or around April of 2015, she was not invited to
attend Genzyme's "Circle of Excellence," an annual event held
for the top 15 Genzyme sales representatives in the country.
She acknowledges that she and another employee finished the year
in a virtual tie for 15th place (Genzyme says Essa finished a
few percentage points behind the other employee so, actually, in
16th position).  And, in her deposition, Essa conceded that she
did not know who determined which employees were invited to the

event, or what other factors Genzyme considered when trying to
distinguish between two employees who had finished the
competition in such close proximity.  Essa Deposition, vol. I
(document no. 17-2), at 136-40.  Nevertheless, Essa says she
should have been invited to the event and she blames Emerson for
the snub.

Essa's speculation on that issue is unsupported and
inconsistent with the record.  It is undisputed that the
decision to invite the other employee rather than Essa was made
by Genzyme employees other than Emerson; he played no role in
deciding which employees were selected for the award.  See
Emerson Affidavit (document no. 18) at para. 21.  See also Essa
Deposition, vol. I, at 137 (testifying, "I don't know that" in
response to the question "Who determines who gets to go to the
Circle of Excellence?").  Indeed, Essa concedes that when she
raised the issue with Emerson, he told her to contact Gary Petit
– the person responsible for the event – with any questions she
might have about it.  Id. at 139.  Yet, Essa declined to do so.
Id. at 138.  More importantly, even assuming (despite the lack
of supporting evidence) that Genzyme wrongfully omitted Essa
from that event, she has pointed to nothing in the record that
suggests her age played any role in that decision.

Given Essa's relatively brief tenure in New Hampshire,
Emerson gave her only one performance evaluation (issued in
March of 2016, for the calendar year of 2015).  In it, he rated
her an "8" on a scale of one to nine (meaning that Emerson
viewed her as having "exceeded expectations").  See Exhibit 9 to
Essa Deposition (document no. 17-4) at 18-24.  By comparison,
the highest score Emerson gave to any of the other Area Business
Managers reporting to him was a "5."  From Emerson's
perspective, Essa clearly stood out as an exceptional performer.
As part of his evaluation of Essa, Emerson wrote:

> Lynne had a fantastic 2015.  Though only her first
> year in the Manchester territory, Lynne is currently
> ranked #4 in the country for Aubagio sales
> performance.  She was fully committed to KOL
> Engagement by increasing the access to and market
> share of Dr. Cabot, Lynne's largest customer.  Lynne
> led the region with programming and positively
> influenced every ABM [Area Business Manager] in their
> understanding of how impactful programming can be on
> sales results.  Lynne's direct questioning and
> efficient messaging allowed customers to quickly see
> the positive benefit/risk profile of Aubagio.  Thank
> you for a great 2015 and for all you do!
>
> * * *
>
> Lynne completed an astonishing 48 patient and
> professional programs in 2015.  This was the most
> programs done in the region by any ABM and the most I
> have seen during my time as an RBD.
>
> * * *
>
> Lynne's commitment to patient programs and her
> strategic implementation of this important resource
> had a positive impact on the entire ABM team.  Many

other ABMs increased their 2015 patient program
volume, in part due to Lynne leading the way with her
execution of these events.  Thank you!

Id.  In her response, authored on March 11, 2016, Essa wrote:

Ryan with your acceptance, leadership, and guidance,
my return home to the New Hampshire territory from
Arizona has been personally and professionally
successful and rewarding.  Thank you for your support
and positive reinforcement.  I look forward to working
with you and the team to make 2016 the best year ever!
Lynne.

Id.  Emerson's evaluation continues for several pages and speaks
of Essa's performance in superlative terms.

Emerson's glowing, near-hyperbolic, evaluation of Essa in
March of 2016, as well as her response to it, stand in sharp
contrast to the allegations in Essa's complaint that, during the
period covered by that evaluation, Emerson was attempting to
undercut her sales and job performance, discriminating against
her on the basis of her age, and creating a toxic, intolerable
workplace.  Essa provides no explanation for that apparent
conflict between the record and her claims.

A couple months after she received her annual review, in
May of 2016, Essa conducted three Genzyme-sponsored programs
with Twitchell/MSEO.  Following those programs, VPR (Genzyme's

agent) contacted Genzyme and reported that, of the ten Genzyme "Ambassadors" in attendance at those programs, four provided negative feedback about Essa and/or Twitchell.  Emerson received a copy of that report from VPR and, from it, he learned of the criticisms directed at Essa.  He also learned that Twitchell was leading the Genzyme-sponsored programs and introducing speakers – contrary to Genzyme policy, as well as Emerson's clear instructions to Twitchell about how such programs had to be organized and run.  See, e.g., Emerson Statement (document no. 23-11) at 15 ("I was concerned about [Essa's] potential treatment of this ambassador, but even more concerned about [Twitchell] potentially running [Essa's] events by introducing speakers and blurring the lines between a Sanofi Genzyme program and an MSEO program/meeting.").  See also Emerson Email to Jennifer Pritchett (document no 23-46) (expressing concerns about the possible appearance of a conflict of interest based upon MSEO's advertising practices and because no MSEO meetings in New England were being held independently of Genzyme-sponsored patient events).

Shortly after receiving that feedback from VPR, on June 1, 2016, Emerson met with Essa and spoke to her about it.  She became upset, called the criticisms of her lies, and had to go to the restroom to compose herself.

Later that day, Essa contacted Carole Huntsman (seemingly as a confidant or mentor.  Huntsman's role at Genzyme is unclear.  See Essa Deposition, vol I, at 102 and 138 (describing Ms. Huntsman simply as "the worldwide leader in MS . . . the top dog")).  In her note to Ms. Huntsman, Essa said she was "shocked at the email [from VPR to Genzyme about negative feedback from the Ambassadors] and that my manager asked for explanations of the accusations.  I thought he knew and respected me.  I left that meeting feeling defeated, confused, and not sure how to move forward with my manager."  Essa email dated June 1, 2016 (document no. 23-25).

Emerson also spoke with his manager about the report from VPR and, given Essa's exceptional history with Genzyme, expressed surprise that she had received any negative feedback.  Despite that negative feedback, Emerson said he did not believe Essa should receive any form of discipline (an odd suggestion if he were truly trying to undermine Essa's career).  Emerson's manager agreed and the two decided that no discipline was warranted.  Instead, Emerson was told that he should "verbally coach" Essa about Genzyme's expectations for interacting with Ambassadors and MSEO's involvement in Genzyme-sponsored programs.  To that end, Emerson scheduled another meeting with Essa for June 6, 2016.  Emerson and his supervisor also agreed

that Emerson would contact Twitchell to clarify (again)
Genzyme's expectations regarding his (and MSEO's) involvement in
Genzyme-sponsored patient programs.  See, e.g., Email from
Emerson to Twitchell dated June 7, 2016 (document 23-31) at 1-2
("Afternoon Wayne, Can we touch base on the phone this week to
revisit how to best and most compliantly work together?").

A few days later, while driving to meet Essa for their
June 6 meeting, Emerson received a phone call from someone in
Genzyme's human resources department, notifying him that Essa
had been taken to the hospital.  Beginning that evening and
continuing over the next few days (before he learned that Essa
would be out on medical leave), Emerson sent Essa several texts
and a voicemail message expressing concern for her health,
wishing her well, and letting her know that the June 6 patient
program he handled in her absence had gone well.  Because Essa
sees those texts as significant evidence supportive of her age
discrimination and/or wrongful termination claims, they are
probably worth recounting:

> **Monday [June 6, 2016] 5:16 PM**  Hope you feel better.
> I will take care of programs and let you know how it
> goes.  No worries.  Going to pick up Dr. B[andari]
> now.
>
> **Monday 7:46 PM**  Program went well.  Good group of 16.
> Most importantly, hope you are feeling ok.

**Tuesday 6:21 PM**  I have been and will continue to be a Lynne Essa advocate and hope I have the opportunity to continue to do so.

**Today 7:45 PM**  Hope you are feeling better.  Can we talk soon?

Emerson Text Messages (document no. 23-30).  Despite the seemingly benign and supportive tone of those messages, Essa apparently saw them as something sinister and a source of significant stress.

On June 9, 2016 (again, before Essa requested a medical leave of absence, but after she had left the hospital), Emerson attempted to reach Essa by telephone.  Essa Deposition, vol. I, at 82-83.  Essa's husband answered, saying, "This is Lynne's husband.  Do not contact, call, text or email my wife again! You hear me?  Take this to heart, son."  Emerson email dated June 10, 2016 (document no. 23-35).  Emerson complied with that request and never contacted, or had any communication with, Essa again.  The following day, Essa emailed Meredith Bowman in Genzyme's human resources department, writing, "Ryan Emerson is texting me.  You need to have him cease any communications with me immediately." (document no. 23-34).

A day earlier, Essa had written another email to Bowman, recounting her original (June 1) meeting with Emerson at which

the two discussed the report from VPR and the negative feedback
it had received from participants at three of Essa's patient
programs. See Essa email to Bowman dated June 8, 2016 (document
no. 23-33). In it, Essa accused Emerson of having played a role
in fabricating one of the negative reviews that was submitted
about her. Emerson denies any role in soliciting or writing any
of the feedback related to Essa's patient programs. See
Affidavit of Ryan Emerson (document no. 18) at para. 12.[1]

---

[1] Several of the "concerns" and "facts" upon which Essa
relies in her papers are unsupported by admissible evidence of
record or, worse, are demonstrably false. This is one of them.
Essa repeatedly claims that Emerson coached/instructed a woman
named Laurie Jewers to write one of the negative reviews. All
admissible evidence of record related to that issue reveals that
claim to be untrue.

Ms. Jewers is an MS patient and has been a Genzyme Patient
Ambassador for six years. She has worked with more than fifty
Genzyme sales representatives, and she has participated in over
one hundred patient outreach programs (including about ten with
Essa). In her deposition, Ms. Jewers unequivocally denied that
Emerson played any role in her decision to submit the negative
feedback about Essa. She also denied that Emerson had any part
in actually writing or editing her feedback. Deposition of
Laurie Jewers (document no. 17-7) at 52-53. Indeed, she
explained at some length why she decided to submit the negative
review of Essa – something she had never done with respect to
any Genzyme sales representative in the past.

As an aside, the court notes that, as a long-time Genzyme
Ambassador, Ms. Jewers is well aware of the Genzyme policies
(and FDA regulations) that govern what she may and may not
discuss in her public presentations as a Genzyme Ambassador.
See, e.g., Id. at 37-38. Her testimony, combined with her
knowledge in that realm, supports Emerson's growing concerns
that Twitchell was violating Genzyme's policies when
participating in those Genzyme-sponsored patient programs. See,
e.g., Jewers' Deposition at 28-29, 33-34, 48-50.

In that same email to Bowman, Essa complained that Emerson had informed her that he would be attending the June 6 patient program in Concord, New Hampshire.  According to Essa, Emerson "sent me a meeting reminder to meet him before the dinner program even though I was scheduled to pick Dr. Bandari up at his hotel and drive him to the dinner."  Id.  Essa implies that Emerson purposefully scheduled their meeting at a time designed to interfere with her plans and put unnecessary pressure on her.  That does not appear to be the case.  See Email from Emerson to Essa dated June 6, 2016 (document no. 23-26) ("When would be the best time to catch up today? . . . I am fairly free after lunch. I also plan to attend your PEP tonight in Bedford N.H.  I can arrive early or stay after, if that works best.").  In any event, Essa apparently found that all quite stressful, telling Bowman:

> By the time I picked up Dr. Bandari at his hotel, I was short of breath, experiencing jaw pain, and chest tightening.  Dr. Bandari took my pulse and agreed that I should go to the emergency room.  I was admitted to Elliot hospital for observation and tests for a heart attack.  When I was asked by the emergency room physician what I was doing before the symptoms appeared, I said I was under extreme pressure to meet with my manager who I am not comfortable with.
>
> June 7th – before I was released from the hospital, Ryan Emerson called and left a message on my personal phone regarding my coverage next week on my four upcoming patient programs.

> I do not see how I can continue to report to a manager
> that is sabotaging my reputation, performance,
> success, and adversely affecting my health.

Essa Email dated June 8, 2016 (document no. 23-33).  Bowman

responded saying, among other things, "[A]s I stated on the

phone, we take all allegations seriously and are committed to

providing a safe work environment free of unlawful

discrimination and retaliation.  As a follow up to that point, I

wanted to share the link to our Issue Resolution Policy."

Bowman Email dated June 6, 2016 (document no. 23-36).


Essa never returned to work after the June 6, 2016, medical

incident.  On June 10, 2016, she requested, and was granted, a

medical leave of absence.  During Essa's medical leave, Emerson

either personally covered, or arranged for another employee to

cover, the several patient programs that Essa had scheduled

prior to her leave.  As noted above, Emerson had no contact with

Essa after texting her on June 8, 2016.


On July 12, 2016 – one month into Essa's medical leave of

absence - Twitchell emailed Emerson, noting that he had not been

able to get in touch with Essa and asking if she would be

attending the programs scheduled for the following week.  He

asked, "If Lynne is not doing the programs in New England, who

will we be working with and who should we give the information

to about attendance at the meetings."  Email chain (document no.

23-38) at 2.  Emerson responded, saying:

> <u>Lynne is on medical leave</u>.  That is all I know, but I
> am hoping she is ok.
>
> I will be covering the programs next week and all
> communication should go through me. . ...
>
> Jenn and I will be covering the programs in August.
> We plan to cover all programs Lynne set up (though <u>may
> change product focus</u>) through October.
>
> <u>My assumption is that Lynne is not going to return</u> and
> if so, we would not plan to continue the regular
> monthly meetings [beyond October].

<u>Id</u>. at 1 (emphasis supplied).  Essa points to that email for

several reasons.  First, she says Emerson should not have

disclosed to Twitchell that she was on medical leave.  Although

Essa refers to that disclosure as "unlawful" and "wrongful," she

does not elaborate on that assertion.  Nor, more importantly,

does she tether it to her wrongful termination or age

discrimination claims.  Second, she seems to suggest that

Emerson's decision to change the focus of those programs from

one Genzyme product to another is indicative of his efforts to

undermine her career.  And, finally, she says the last sentence

– "my assumption is that Lynne is not going to return" – is

evidence of Emerson's age bias against her.

A few weeks later, Essa says she noticed that her work
territory assignment was listed as "vacant" on a Genzyme
internal website.  She brought that fact to the attention of a
Genzyme employee, who expressed surprise, noted that should not
be the case, and said she would look into it.  Essa repeatedly
claims that Emerson was personally responsible for marking her
territory as vacant.  <u>See, e.g.</u>, Plaintiff's Memorandum
(document no. 23-1) at 19; Plaintiff's Sur-reply (document no.
26) at 3 and 4.  Yet, she has pointed to no evidence linking
Emerson to what appears more likely to have been an
administrative error.  Her allegations against Emerson in that
regard are speculative and unsupported by any admissible
evidence.

Prior to her medical leave, Essa had scheduled six programs
in September and October of 2016, at which she planned to
provide attendees with information about Aubagio (those are the
programs referenced in Emerson's email to Twitchell, above).
But, due to changing market conditions, Emerson switched the
topic of those programs to another Genzyme MS treatment called
Lemtrada.  And, given Essa's absence, each of those programs was
covered by another Genzyme employee.  Essa claims Emerson
"cancelled" her programs while she was on medical leave, <u>see,</u>
<u>e.g.</u>, Plaintiff's Memorandum at 19; Plaintiff's Sur-reply at 3,

4, and 5, but that does not appear to have been the case.  There
was, to be sure, some confusion surrounding the scheduling of
those programs (seemingly because of the change in focus from
one drug to another, which meant new invitations had to be
prepared, approved, printed, and distributed).  But, those
patient programs appear to have been held (though perhaps
without the involvement of Twitchell – the record is not clear).
See, e.g., Emerson Email to Twitchell dated August 22, 2016
(document no. 23-45) ("Below is a list of the events we will be
completing.  We changed all of Dr. Cabot's programs to Lemtrada,
due to market dynamics.  All other details have remained the
same.  We will give you updated invites once they are
generated.").  See also Affidavit of Ryan Emerson at para. 19
(discussing the six programs, noting the change in focus from
one drug to another, and stating that each was covered by
another Genzyme sales representative).  While there was (and
remains) some confusion surrounding those programs, it is clear
that Essa perceived the changes to them as another effort by
Emerson to undermine her career.

About three months into her medical leave, on September 26,
2016, Essa sent an email to the head of Genzyme's human
resources department.  In it, she accused Emerson of having
engaged in "unwelcome touching and hugging" at company meetings

and claimed he had asked her "offensive personal questions."
Essa Email dated September 26, 2016 (document no. 17-4) at 35.
She explained her failure to report those incidents in a more
timely manner as the product of fear that she might suffer some
form of retaliation.  Id.  But, nowhere in that email – indeed,
at no time prior to filing her complaint with the New Hampshire
Human Rights Commission - did Essa ever complain of any age-
based discrimination.

For the record to be clear, further explanation of Essa's
accusations against Emerson is required.  Emerson's "offensive
personal questions" occurred in a group "team building" meeting
that included Essa and seven or eight other Area Business
Managers.  Emerson presented each with an open-ended request:
give a brief timeline of your life, from childhood to adulthood.
Essa Deposition, vol. I, at 111.  It is unclear why Essa would
find that question "offensive" and overly personal, but it is
evident that she did not want to provide such information in
that setting.  So, she says she "kind of did an overview" of her
life.  Id. at 112-13.

As for Emerson's alleged inappropriate hugging, Essa says
he would hug her and other Area Business Managers at various
meetings.  According to Essa, it only occurred at group meetings

(never when the two were alone) and it was not "in a sexual manner." Nevertheless, she did find it unpleasant and unwelcome. So, after the second time Emerson allegedly hugged her, she says she asked him to stop. Despite that request, Essa claims Emerson hugged her two or perhaps three more times. See Essa Deposition, vol. I, at 93-94, 110. Essa has not linked the alleged hugging in any way to her age.

Genzyme responded immediately to Essa's email. Maya McLean, of the human resources department, contacted Essa about her charges. But, Essa refused to discuss those claims while she was on medical leave. Instead, Essa suggested they speak on November 18 (the date she was originally scheduled to return to work). Subsequently, however, she decided not to cooperate with McLean's investigation into her charges against Emerson.

On October 9, 2016, Emerson was promoted to the position of Director of Commercial Operations. Essa learned of Emerson's promotion and understood that, upon returning to work, she would no longer report to Emerson and that he would have no supervisory responsibility over her (or any other Area Business Managers in Essa's region). Essa's new supervisor was (or would have been) Teresa Marin. Nevertheless, Essa says she was concerned because Emerson's new job description stated that he

22

would, among other things, "serve as the main liaison between
the US MS team and compliance."  Promotion Announcement
(document no. 17-6) at 27.  Given Emerson's earlier concerns
about Twitchell/MSEO and their potential failure to adhere to
Genzyme policies, Essa says she feared that, upon her return to
work, Emerson would target her for "compliance" issues – even
though Emerson never raised any such issues with her, or about
her, in the past.  Again, the admissible evidence of record
reveals that Emerson's "compliance" concerns related exclusively
to Twitchell and MSEO when participating in Genzyme-sponsored
events.  See, e.g., Emerson Statement (document no. 23-11) at 3
("I was uncomfortable with how the programs would be set up and
knew we would have to take more control of the program details
if we were going to work with Wayne; however, I did want to give
Lynne the opportunity to work with a resource she found so
helpful in the Arizona market.  I decided we would test drive
this working relationship, but just with Lynne's territory.");
Emerson Email (document no. 23-46) (after covering six events
with Twitchell/MSEO, Emerson summarized his concerns with MSEO's
involvement in Genzyme-sponsored events; no mention is made of
any concerns about Essa's behavior, performance, or compliance
with Genzyme policies).  Consequently, while the court has no
reason to doubt that Essa's fears were real, they do not appear
to have been well-founded.

Essa's medical leave was extended to January 2, 2017.  A few weeks prior to that date, on December 21, 2016, Essa's legal counsel sent a letter to Genzyme, stating:

> Ms. Essa is scheduled to return to work from her medical leave on January 2, 2017.  Ms. Essa has been medically released and is <u>ready and able for her return</u>.  . . .

> While it is certainly possible to review the details of Ms. Essa's workplace complaints involving Mr. Emerson, the purpose of this letter is an attempt to look beyond those issues to reach a fair accommodation of the interests of both Ms. Essa and Genzyme.

> While Ms. Essa is <u>prepared to return on January 2, 2017, and devote her full efforts</u> to achieving her record of success, we propose a resolution along the following terms.

Counsel's Letter (document no. 17-4) at 41-42 (emphasis supplied).  In short, Essa's counsel proposed that Genzyme provide Essa with a severance payment of slightly more than a quarter million dollars.  Genzyme declined Essa's proposal and informed her that, upon her return to work, she would again be contacted by Maya McLean to follow up on her investigation into Essa's reports of Emerson's inappropriate workplace conduct.  Indeed, to that end, McLean reached out to Essa again and left her a voicemail, but Essa "chose not to [call her back]."  Essa Deposition, vol. II (document no. 17-5) at 220.

After her "severance package" proposal was rejected, and just nine days after having expressed her readiness, willingness, and ability to return to work, Essa had a change of heart.  She resigned.  In her resignation letter to Genzyme, Essa wrote that "the conditions created by my supervisor, Ryan Emerson, became so intolerable that I am unable to execute my duties and fear for my health and safety."  Essa Letter of Resignation, dated December 30, 2016 (document no. 23-51).  She went on to characterize Emerson's behavior as "predatory."  She also criticized Genzyme's decision to promote Emerson, and she declared that "I am left with no choice but to resign from Sanofi Genzyme whose culture supports a poisonous work environment."  Id.

On March 10, 2017, Essa filed a charge of discrimination with the New Hampshire Commissioner for Human Rights and the EEOC.[2]  This litigation ensued.

---

[2]    New Hampshire law requires individuals to file complaints within 180 days of any alleged acts of discrimination. Consequently, barring limited exceptions which do not appear to apply in this case, any claims arising from conduct prior to September 11, 2016, are time-barred.  Essa's last contact with Emerson was more than three months prior to that date (i.e., the text message Emerson sent to Essa on June 8, 2016).  Thus, says Genzyme, because Essa's age discrimination claim under the NHLAD derives entirely from her interactions with Emerson, that NHLAD claim is timed-barred.  Genzyme is likely correct, but the court need not resolve that issue.

**Discussion**

I.   Age Discrimination.

To prevail on an age discrimination claim under either New Hampshire's Law Against Discrimination or the federal Age Discrimination in Employment Act, Essa must establish that she would not have experienced an "adverse employment action" if it were not for her age.  The Court of Appeals recently discussed the analytical framework this court must employ when addressing such claims on summary judgment:

> The employee who brings the ADEA claim bears the burden of proving that the age discrimination that the statute bars was the but-for cause of his termination. To determine whether an ADEA claim may survive summary judgment when there is no direct evidence of such age discrimination, we apply a burden-shifting framework akin to the one that the United States Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to determine whether a claim of race discrimination in employment under Title VII of the Civil Rights Act of 1964 may survive summary judgment.
>
> The focus at the first step of the inquiry under this burden-shifting framework is on whether the plaintiff has put forth evidence from which a juror reasonably could find that a prima facie case of age discrimination has been established.  To pass this first step of the inquiry, the plaintiff-employee must provide evidence from which a juror reasonably could find that: (1) he is at least forty years old; (2) his work was sufficient to meet the employer's legitimate expectations; (3) his employer took adverse action against him; and (4) either younger persons were retained in the same position upon his termination or the employer did not treat age neutrally in taking the adverse action.

If the plaintiff succeeds in getting past this first
step of the inquiry, then, at the second step, the
defendant must proffer a legitimate, nondiscriminatory
reason for the employee's termination.  If the
defendant puts forth such a reason, then, at the third
step of the inquiry, the burden of production shifts
back to the plaintiff, who must then show, by a
preponderance of the evidence, that the employer's
articulated reason for the adverse employment action
is pretextual and that the true reason for the adverse
action is discriminatory, for, otherwise, the
defendant is entitled to summary judgment.

Notably, to satisfy this burden with respect to
pretext, the plaintiff must elucidate specific facts
which would enable a jury to find that the reason
given by the defendant for the adverse employment
action is not only a sham, but a sham intended to
cover up the employer's real motive: age
discrimination.  Thus, at this third step, the
plaintiff must point to evidence that creates a
genuine issue of disputed material fact as to whether
the proffered reason was a pretext for an age-based
motive.

Zabala-De Jesus v. Sanofi-Aventis Puerto Rico, Inc., 959 F.3d

423, 428-29 (1st Cir. 2020) (citations and internal punctuation

omitted).  See also Sabinson v. Trustees of Dartmouth Coll., No.

CIV. 05-CV-424-SM, 2007 WL 4191943, at *14-15 (D.N.H. Nov. 21,

2007).


In her opposition memorandum (document no. 23-1), Essa does

not point to specific evidence she believes establishes a prima

facie case of age discrimination – that is, evidence that

Genzyme did not treat age neutrally in taking an adverse action

against her.  Instead, she presents a lengthy narrative of

alleged slights and sources of stress and discomfort.  She then blends them together to suggest that the evidence, viewed as a whole, is sufficient to support <u>all</u> claims in her complaint. <u>See</u> Plaintiff's Memorandum at 13-19 (pointing to her exclusion from the "Circle of Excellence" awards; Emerson's allegedly "offensive" personal questions; Emerson's alleged unwelcomed hugging; Emerson's texts and telephone call to her while, or shortly after, she was in the hospital; Emerson's alleged "cancellation" of the programs she had organized; Emerson's alleged efforts to undermine her relationship with Twitchell/MSEO).  Given that scattershot approach, it is difficult to tell precisely what evidence she believes supports her age discrimination claims.

Her sur-reply memorandum is more focused.  In it, Essa has attempted to identify the specific evidence upon which she relies in support of her age discrimination claim, saying:

> The facts presented by the plaintiff include, in addition to the noted fact that <u>Ms. Essa was 65 years old</u> and 10 years older than any other employee in her region, and one of two employees over 42 years old, Exhibit 50 (Doc. 23-51, under seal) – the following additional facts to support the nexus between the hostile work environment and age animus:
>
> a) Mr. Emerson's email to Mr. Twitchell indicated that Mr. Emerson's "<u>assumption is that Lynne is not going to return [to work]</u>", despite her participation in an approved leave, her stated intent that she was in

fact going to return, and her important relationship
with Mr. Twitchell and MSEO; Exhibit 36 (Doc. 23-37);

b) Mr. Emerson's "unlawful" disclosure to Mr.
Twitchell that Ms. Essa was on medical leave, id.;

c) Mr. Emerson's indication to Mr. Twitchell that Ms.
Essa is going to retire and saying "that Lynne will
not be coming back," Exhibit 41 (Twitchell E-Mail)
(Doc. 23-42);

d) on Ms. Essa's 65th birthday, on October 7, 2015,
Teresa Marin, who would have taken over for Mr.
Emerson as Ms. Essa's supervisor, called [to wish Essa
happy birthday] and asked when Ms. Essa was going to
retire, Exhibit 1 (Essa Depo.), at 98-100 (Doc. 23-2,
at 18-20);

e) despite Ms. Essa being promised a role selling the
new drug Lemtrada when approved, Doc. 17-1, at 26,
when the drug was approved, Mr. Emerson announced
employee J.J. would have the position, and when he
changed Ms. Essa's programs to Lemtrada while she was
on leave, Mr. Emerson gave these programs (and Ms.
Essa's most important physician contact) to employee
J.J. [Jennifer Joscelyn].  Exhibit 43 (Doc 23-44), at
1; Exhibit 9 (Doc 23-10), at 23.  Employee J.J. is 36
years old to Ms. Essa's 66 years old.

Plaintiff's Sur-reply at 2.  Taken at face value, the allegation

most supportive of her age-discrimination claim is plainly the

last.  But, because Essa has presented it in a way that might be

misconstrued, it does require some clarification.


Initially, the court notes that Essa's reference in her

sur-reply memorandum to her alleged denial of the Lemtrada sales

position is the first in any of her papers.  Neither the

Lemtrada sales representative, Ms. Joscelyn, nor the sales

position itself, is mentioned in Essa's Amended Complaint, or her deposition, or her memorandum opposing summary judgment. Consequently, Genzyme has not had the opportunity to respond to Essa's claim.

Nevertheless, the implication is plain: Emerson discriminated against Essa on the basis of age by wrongfully awarding the Lemtrada sales position to a younger employee rather than Essa and he subsequently made Essa's job more difficult by "giving" that younger employee Essa's most important physician contact.  If that were true, it might be fairly compelling evidence in support of Essa's prima facie age discrimination claim.  Yet, Essa's recounting of those events does not appear to be accurate.

First, Essa has cited no record support for Emerson's alleged "announcement" that Ms. Joscelyn, rather than Essa, was awarded the position of Lemtrada sales representative.  Nor has she suggested that Emerson even had such authority.  Genzyme's corporate decisions about which employees would represent which drug(s) in any particular region are not addressed anywhere in the record.  Nor does Essa allege when that "announcement" was made, or if she sought the position, or even that the sales position was filled after she transferred to New Hampshire (that

is, at a time when she might have been considered a candidate for the position).

This much can, however, be stated with confidence:  When Genzyme approved Essa's transfer request and offered her the position of "Senior Area Business Manager – Manchester, N.H.," that offer clearly stated that she would "remain in [her] current role and continue to focus on sales of Aubagio unless and until a transition date [to sales of Lemtrada] is confirmed in writing."  Offer of Employment dated October 17, 2014 (document no. 17-1) at 1.  Essa has pointed to no record evidence suggesting that she ever received written notice of such a transition to Lemtrada sales (or even that she sought such a transition).  Yet, she seems to imply that Emerson denied her that (presumably desirable) opportunity on the basis of her age and awarded it, instead, to a much younger employee.  If that is, indeed, what Essa is saying, there is no record support for such an assertion.

Rather, this appears to have happened: when Emerson decided to change the focus of some (but not all) of the Genzyme-sponsored programs in September and October of 2016 (while Essa was out on medical leave), from Aubagio (Essa's drug) to Lemtrada, he asked the existing regional Lemtrada sales

representative to attend those meetings (no one was promoted over, or to the exclusion of, Essa while she was on medical leave).  That sales representative is Ms. Joscelyn and she is referenced in the documents as the "Lemtrada North" Area Business Manager.  By comparison, Essa is referenced in those same documents as "Lynne, Aubagio Manchester."  See Schedule of September and October, 2016 Events (document no. 23-24) at 2.

It also appears that Ms. Joscelyn had been the regional Lemtrada sales representative since at least August of 2015 – a full year prior to Emerson's decision to change product focus at the meetings.  See, e.g., Essa Mid-Year Performance Review – August 31, 2015 (document no. 23-6) at 4 (Essa states, "I am looking forward to partnering with Jen Joscelyn (Lemtrada) for dual patient programming in the near future" – suggesting, of course, that no later than August of 2015 Ms. Joscelyn was already the Lemtrada sales representative in the region).

Viewed in that fuller factual context, it is entirely understandable why Ms. Joscelyn, the Area Business Manager responsible for Lemtrada sales, attended the patient programs at which Lemtrada was being discussed.  See generally Essa Deposition, vol. 1, at 15-16 (stating that she never sold Lemtrada for Genzyme; the only drug she sold was Aubagio).  If,

as Essa claims, Emerson did announce Ms. Joscelyn's promotion to regional Lemtrada ABM, such an announcement necessarily occurred well before the time period relevant to any of Essa's discrimination claims.  Moreover, the record does not support Essa's implication that Emerson promoted Ms. Joscelyn over, or instead of, Essa.

Additionally, it is unclear what Essa means when she says that Emerson "gave" Dr. Cabot – "Essa's most important physician contact" - to Ms. Joscelyn.  Ms. Joscelyn simply covered a few Genzyme-sponsored events at which Dr. Cabot also appeared.  In the same timeframe (apparently still believing Essa would be returning to work), Emerson scheduled Essa to attend those meetings at which he wanted Aubagio to remain the focus.  See Emerson email to Twitchell (document no. 23-45) at 2 (providing the list of events scheduled for September and October of 2016).

Thus, for Essa to claim (or, at a minimum, strongly imply) that, in September of 2016, Emerson discriminated against her in favor of an employee 30 years her junior by (a) "announcing" that the younger employer "would have the position" of Lemtrada sales representative and then (b) "giving" that younger employee Essa's "programs" as well as her "most important physician contact" is, at best, misleading.  See generally, Essa Mid-Year

Performance Review – August 31, 2015 (more than a year before these events, praising Essa for having "helped the Lemtrada team secure access to Dr. Cabot"). See also Essa Year End 2015 Performance Review (document no. 23-7) (in which Essa wrote that she had "shared speaking dates as well as setting up the programs of Dr. Cabot with Jen Joscelyn for Lemtrada programming in Nov. & Dec. [of 2015]"). See also Id. at 5-6 (Emerson wrote, "Lynne collaborated nicely with her Lemtrada ABM overlay and repeatedly helped her neighboring Aubagio ABM by creating access to HCPs with whom Lynne has longstanding relationships. Thank you so much for taking the time to go outside of your territory to help another ABM on the team!").

Nevertheless, even looking beyond the factually inaccurate claims in Essa's papers, and assuming the evidence were sufficient to show that Emerson/Genzyme "did not treat age neutrally" when dealing with her, Essa's prima facie case suffers from another defect: she has failed to clearly articulate precisely what "adverse employment action" she suffered (aside from an arguably stressful work environment). See, e.g., Alvarado-Santos v. Dep't of Health of The Commonwealth Of Puerto Rico, 619 F.3d 126, 132 (1st Cir. 2010) ("The prima facie case varies according to the nature of the plaintiff's claim but it requires, among other things, a showing

34

of an adverse employment action.").  An adverse employment
action is one that "affects employment or alters the conditions
of the workplace" and it must "materially change the conditions
of plaintiff's employ.  These changes must be more disruptive
than a mere inconvenience or an alteration of job
responsibilities."  <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 25
(1st Cir. 2017) (citations and internal punctuation omitted).

Moreover, even if Essa had pointed to sufficient,
admissible evidence to make out a prima facie case of age
discrimination, Genzyme has responded with legitimate, non-
discriminatory bases for Emerson's (and, more broadly,
Genzyme's) allegedly wrongful conduct:[3]

> 1.  <u>Circle of Excellence</u>.  Essa was not invited to
> attend the Circle of Excellence awards ceremony
> because she did not qualify for the award.  Emerson
> played no role in that decision.
>
> 2.  <u>Offensive Personal Question</u>.  The question asked
> by Emerson which Essa found offensive was posed to a
> diverse group of employees at a "team building" event.
> It was not tied in any way to Essa's age, nor did it
> target her in any way because of her age.
>
> 3.  <u>Emerson's Calls and Texts</u>.  It is undisputed that
> Emerson reached out to Essa while she was in the
> hospital.  But, explains Genzyme, he did so to check
> on her well-being and to assure her that her work
> commitments were being covered by other employees.

---

[3]    The exception, of course, being Emerson's alleged hugging
of Essa.  But, again, Essa has failed to link that alleged
conduct in any way to her age.

Again, says Genzyme, nothing in the record even hints
that Emerson's actions were related to, or motivated
by, any bias against Essa's age.

4.   "<u>Cancellation" of Essa's Patient Programs</u>.
Genzyme says that, despite Essa's claims to the
contrary, those programs were not "cancelled."
Rather, Emerson changed the focus of some of those
programs from one Genzyme MS drug to another for
legitimate business reasons and, because Essa was out
on medical leave, each program was covered by another
Genzyme employee.

5.   <u>Emerson's Contacts with Twitchell/MSEO</u>.  Genzyme
says that Emerson's direct contacts with Twitchell
arose out of a growing and well-founded concern –
supported by the third-party feedback provided to VPR
- that Twitchell and MSEO were not complying with
Genzyme's policies governing Genzyme-sponsored patient
meetings.  Those contacts (as well as Emerson's
eventual recommendation to his superiors that Genzyme
stop using MSEO in his region) were unrelated to
Essa's age or any age-related bias on Emerson's part.

Those responses place the burden back on Essa to point to

evidence that creates a genuine issue of disputed material fact

as to whether the proffered explanations for Genzyme's actions

are, in fact, a pretext designed to conceal an age-based motive.

<u>See</u> <u>Zabala-De Jesus</u>, 959 F.3d at 429.  She has not, however,

identified any admissible evidence linking her age to any of the

business decisions made by Emerson and/or Genzyme.  For example,

in her deposition, Essa conceded that Emerson never made any

negative comments about her age to her.  Essa Deposition, vol.

I, at 114.  The only piece of admissible evidence arguably

(though doubtfully) related to Essa's age is Emerson's comment

36

to Twitchell that he did not expect Essa to return from medical leave (speculation which ultimately proved accurate). But, even if that comment did relate in some way to Essa's age (rather than, say, her medical condition), mere "recognition of plaintiff's age is simply not the same thing as discriminatory animus based upon her age." Sabinson v. Trustees of Dartmouth Coll., No. CIV. 05-CV-424-SM, 2007 WL 4191943, at *15 (D.N.H. Nov. 21, 2007) (collecting cases). The same is true with respect to Essa's claim that, on her 65th birthday in October of 2015, Teresa Marin called to wish her happy birthday and allegedly asked her about her retirement plans.[4]

The evidence upon which Essa relies is insufficient to permit a reasonable, properly-instructed jury to find that the reasons given by the defendant for its conduct toward her (assuming that conduct rose to the level of "adverse employment action") was "not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." See Zabala-De Jesus, 959 F.3d at 429. In short, based upon this record, a

---

[4]   Parenthetically, the court notes that Laurie Jewers, the Genzyme Ambassador, testified that Essa talked openly about her retirement at one of the patient programs she attended. See Jewers Deposition (document no. 17-7) at 34 ("Lynne also made the comment that she can't wait to retire."); Id. at 35-36 (attributing to Essa the statement, "I'm ready to retire.").

reasonable trier of fact could not, as a matter of law, conclude
that Essa was the victim of any unlawful age-based
discrimination by Emerson and/or Genzyme.

II.   Wrongful Termination/Constructive Discharge.

Under New Hampshire common law, to prevail on a claim for
wrongful discharge, a plaintiff must establish three essential
elements: (1) that her employment was terminated; and (2) the
termination of her employment was motivated by bad faith,
retaliation, or malice; and (3) her employment was terminated
because she performed an act that public policy would encourage
or because she refused to do something that public policy would
condemn.  See Karch v. BayBank FSB, 147 N.H. 525, 536 (2002).
Here, of course, Essa was not terminated.  She resigned.  But,
she claims she was compelled to do so by her toxic and
intolerable working conditions.  Accordingly, Essa says she was
"constructively discharged."

Constructive discharge can satisfy the "termination"
element of a wrongful discharge claim.  See Id. at 536.  But, to
prove that element, Essa must establish that Genzyme's actions
rendered her working conditions "so difficult and intolerable
that a reasonable person would feel forced to resign."  Id.
"Constructive discharge is not established by showing relatively

minor abuse of an employee.  Rather, the adverse working
conditions must generally be <u>ongoing</u>, <u>repetitive</u>, <u>pervasive</u>, <u>and
severe</u>."  <u>Lacasse v. Spaulding Youth Ctr.</u>, 154 N.H. 246, 249
(2006) (citations and internal punctuation omitted) (emphasis
supplied).  It is a high threshold.  <u>See, e.g.</u>, <u>Gallagher v.
Unitil Serv. Corp.</u>, No. 14-CV-20-SM, 2015 WL 5521794, at *7
(D.N.H. Sept. 17, 2015).  <u>See also</u> <u>Suarez v. Pueblo Int'l, Inc.</u>,
229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon,
and those who labor in it are expected to have reasonably thick
skins - thick enough, at least, to survive the ordinary slings
and arrows that workers routinely encounter in a hard, cold
world.  Thus, the constructive discharge standard, properly
applied, does not guarantee a workplace free from the usual ebb
and flow of power relations and inter-office politics.").

     Essa has not met that high threshold.  While she plainly
considered her working conditions to be stressful, she has
failed to point to admissible evidence sufficient to warrant the
conclusion that they were so intolerable, so severe, and so
pervasive that a person of ordinary firmness would have felt
compelled to quit.  Consequently, she cannot establish the first
element of her wrongful termination claim: that she was
constructively discharged.  <u>See generally</u> <u>Gerald v. Univ. of
Puerto Rico</u>, 707 F.3d 7, 25 (1st Cir. 2013) ("Constructive

discharge typically refers to harassment so severe and
oppressive that staying on the job while seeking redress - the
rule save in exceptional cases - is so intolerable that a
reasonable person would have felt compelled to resign. . . The
standard to meet is an objective one, it cannot be triggered
solely by an employee's subjective beliefs, no matter how
sincerely held.") (emphasis supplied) (citations and internal
punctuation omitted).  See also Essa's Letter from Counsel to
Genzyme dated December 21, 2016 (document no. 17-4) at 41-42
(representing that, as of December 21, 2016 - just nine days
before she authored her letter of resignation - Essa was
"ready," "able," "prepared," and "planning" to return to work).

        Essa's wrongful termination claim also fails for several
additional reasons.  Even if she had demonstrated that she was
constructively discharged, she cannot establish that it was
associated in any way with her "performing an act that public
policy would encourage or for refusing to do something that
public policy would condemn."  In her memorandum, she points to
her alleged "concerns" that Emerson, through various
communications with Twitchell, was attempting to gain access to
MSEO membership databases, as well as the names of MSEO members.
See, e.g., Amended Complaint at paras. 22, 53, 74, 75, 77;
Plaintiff's Sur-reply at 5.  See also Essa Deposition, vol. I,

at 87, 105, and 153 (claiming (falsely) that Emerson sought

MSEO's "database of the patients and all their information.").

Such conduct, says Essa, may have violated patient

confidentiality and as well as provisions of HIPAA.[5]


Nevertheless, even assuming Essa had such concerns, it is

undisputed that she never communicated them to anyone at

Genzyme.  See Essa Deposition, vol. I, at 147-48, 151-52, and

154.  Consequently, even if silently harboring concerns about

potential HIPAA violations was an act that public policy would

---

[5]     For the sake of accuracy, the court notes that Essa has
pointed to no admissible evidence in the record to support her
"concerns" that Emerson sought to violate provisions of HIPAA by
requesting MSEO membership lists, confidential medical
information, or MSEO databases from Twitchell.  Instead, Emerson
told Twitchell that, consistent with Genzyme standard practices,
responses to invitations to attend Genzyme-sponsored patient
programs should be sent to AHM, the third party with which
Genzyme had contracted to collect information on attendance at
Genzyme-sponsored events.  Emerson Affidavit (document no. 18)
at para. 8-9.  See also Emerson email to Twitchell (document no.
23-31) at 3, item 6.  In fact, despite the alleged "concerns"
set forth in her papers, Essa conceded that she had no personal
knowledge of Emerson ever requesting access to MSEO's patient
databases or asking Twitchell to send patient RSVPs directly to
him or Genzyme.  Essa Deposition, vol II, at 206-07.  The source
of Essa's so-called "HIPAA concerns" seems to be an email that
Twitchell sent to Genzyme in August of 2016.  See Twitchell
Email (document no. 23-43) (complaining, without elaboration,
that Emerson's request for the names and email addresses [i.e.,
not MSEO databases or membership lists] of people who had
registered to attend Genzyme-sponsored events somehow "violated
HIPAA").

encourage (it plainly is not),[6] Essa's failure to report those

concerns meant that neither Emerson nor Genzyme was aware of

them.  Essa cannot, then, establish the essential connection

between her laudatory/protected conduct and the allegedly

intolerable working conditions she says Emerson and/or Genzyme

forced her to endure.  That causal link between protected

activity and an adverse employment action is critical to a

wrongful discharge claim.

    In a related effort to satisfy the "public policy" element

of her wrongful termination claim, Essa also points to various

reports she made concerning perceived unfair or unwarranted

treatment of her by Emerson – particularly what she believed

were his unjustified attempts to "undermine" her relationship

with Twitchell/MSEO.

> Further, after Ms. Essa reported her concerns to
> management and human resources in June of 2016 - which
> concerns included disagreement over compliance issues,
> that her manager was falsely accusing her and MSEO of
> compliance issues, and that Mr. Emerson wrongfully had
> a patient ambassador compose a complaint against her
> and Mr. Twitchell - Mr. Emerson took substantial steps
> to make the workplace unbearable and unsuccessful for

---

[6]    The common law claim for wrongful termination focuses on an
employee's conduct, not her subjective (unexpressed) concerns or
her status (e.g., her age, ethnicity, disability, or mental
impairment).  See  Faulkner v. Dartmouth Hitchcock Med. Ctr.,
No. 12-CV-482-SM, 2015 WL 4759425, at *8-9 (D.N.H. Aug. 12,
2015); Parker v. MVM, Inc., 2006 WL 1724359 *2-3, 2006 DNH 70
(D.N.H. 2006).

> her if she returned, including <u>marking her territory
> as vacant</u>, <u>cancelling her patient programs</u>, and
> <u>terminating the relationship with MSEO</u>.

Plaintiff's Memorandum at 22 (emphasis supplied).  According to
Essa, "Public policy encourages employees such as Ms. Essa to
make such reports of perceived wrongful activity."

Essa is mistaken.  Under New Hampshire common law,
"[p]ublic policy does not protect an employee's expression of
disagreement with a management decision."  <u>MacKenzie v. Linehan</u>,
158 N.H. 476, 481 (2009) (citation omitted).  That Essa reported
"concerns" that were based on numerous, demonstrably false
assumptions, is another matter and of little moment at this
juncture.  She has failed to show that she engaged in the type
of "protected activity" that the tort of wrongful discharge is
designed to encourage and defend.

Finally, as to the third element of her wrongful discharge
claim, aside from using conclusory labels, Essa has not pointed
to any evidence that might plausibly be interpreted as
suggesting bad faith, retaliation, or malice on the part of
Emerson or Genzyme.  Indeed, the record supports the conclusion
that Emerson thought Essa was an exceptional sales
representative and a valued employee.  <u>See, e.g.,</u> Emerson's

Annual Review of Essa.  While he was undeniably troubled by behavior on the part of Twitchell and MSEO, that does not suggest he (or Genzyme) harbored any resentment, ill will, or malice toward Essa.

## Conclusion

For the foregoing reasons, as well as those set forth in defendant's memoranda (documents no. 16 and 25), defendant's Motion for Summary Judgment (document no. 15) is granted as to all claims in plaintiff's amended complaint.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 8, 2020

cc:  Christopher T. Meier, Esq.
     Francis J. Bingham, Esq.
     Christopher B. Kaczmarek, Esq.